Filed 3/23/22

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re K.T. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNANDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.M. et al., Defendants and Appellants. | E077791 (Super.Ct.Nos. J280205 & J282898) OPINION |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Conditionally reversed with directions.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant, J.M.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant, K.T., Sr.

1

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant, D.M.-S, Sr.

Tom Bunton, County Counsel and Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

To effectuate the Indian Child Welfare Act's (ICWA)[1] goal of protecting the best interests of Indian children in custody proceedings, our Legislature amended the Welfare and Institutions Code to require child protection agencies to conduct further inquiry into ICWA's applicability when there is "reason to believe" an Indian child is involved.[2] The amendment, which took effect in January 2019, requires social workers to contact—"as soon as practicable"—extended family members, the Bureau of Indian Affairs (BIA), the relevant tribe or tribes, "and any other person that may reasonably be expected to have information regarding" the child's membership or eligibility for tribal membership. (Welf. & Inst. Code, § 224.2, subd. (e) & (e)(2)(A)-(C), unlabeled statutory citations refer to this code.) The sole issue in this appeal from termination of parental rights is whether San Bernardino County Children and Family Services (CFS) complied with this duty in the dependency proceedings involving nine-year-old K.T. and his two-year-old sister, D.

---

[1] 25 U.S.C. § 1901 et seq.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

Early on in the case, the children's mother and K.T.'s father (father) reported they had possible Cherokee, Choctaw, and Blackfeet ancestry and gave CFS contact information for family members who might be able to provide more detail. CFS never followed up, and the juvenile court found ICWA didn't apply without first ensuring CFS had pursued these leads. About two years into the proceedings, after the parents failed to reunify with the children, the court determined they were likely to be adopted and terminated parental rights.

On appeal, mother and father argue that despite having reason to believe K.T. and D. were Indian children, CFS failed to conduct adequate further inquiry under section 224.2 to determine whether ICWA applies. CFS concedes their error, and rightly so, as the record contains no indication they made any effort to investigate the parents' claims of Indian ancestry. As a result, the record does not support the juvenile court's finding that ICWA does not apply, and we must reverse the orders terminating parental rights and remand the case for further proceedings.

We publish our opinion not because the errors that occurred are novel but because they are too common. Child protective agencies and juvenile courts have important obligations under ICWA. Failing to satisfy them serves only to add unnecessary uncertainty and delay into proceedings that are already difficult for the children, family members, and caretakers involved. Delayed investigation may also disadvantage tribes in cases where it turns out ICWA does apply, as their opportunity to assume jurisdiction or intervene will come at a late stage in the proceeding.

3

# I

# FACTS

CFS began investigating this family for physical abuse in January 2019 after one of mother's children died in her care and the autopsy revealed the child bore signs of nonaccidental trauma. At the time, mother and D.'s father, D.M., were living together and caring for K.T. and his younger half brother, D.M., Jr., who is not a party to this appeal. D. had not yet been born, and K.T.'s father, was incarcerated.

At the initial detention hearing in March 2019, mother claimed Blackfeet ancestry through the maternal grandfather. She provided his full legal name and phone number, as well as the name, phone number, and address of the maternal aunt. The maternal grandmother, who was also present at the hearing, provided dates and places of birth for the maternal grandfather and great-grandmother. The juvenile court told mother CFS would try to obtain additional information from these family members, but the record contains no indication they ever did. Instead, a few weeks later, CFS sent notice to the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana that omitted tribal and biological information for the maternal great-grandmother, despite the maternal grandmother having provided some of that information at the detention hearing.

On April 12, 2019, father filed an ICWA-020 form claiming Cherokee and Blackfeet ancestry through the paternal great-grandfather and his relative "Edna C." A few days later, he made his first court appearance, accompanied by the paternal grandmother. He reported possible Choctaw ancestry, and the paternal grandmother

provided dates and places of birth for herself and the paternal great-grandfather. On April 29, he filed a second ICWA-020 form listing only Choctaw ancestry.

On June 20, CFS sent notice to the Blackfeet and Cherokee tribes but did not send notice to any of the three federally recognized Choctaw tribes. (86 Fed.Reg. 7554-7558 (Jan. 29, 2021); see also 25 U.S.C. § 5131 [requiring the Department of the Interior to publish a list of federally recognized tribes in the Federal Register every year].) As with the earlier notices, these also omitted tribal and biological information about the maternal great-grandmother. They also omitted tribal information for father and the paternal grandmother and contained no information regarding the paternal great-grandfather.

The court held the jurisdiction and disposition hearing for K.T. and D.M., Jr., on June 24, 2019. It sustained allegations of physical abuse against mother and D.M., took dependency jurisdiction over the children under section 300, subdivision (a), removed them from mother and D.M.'s custody, and ordered family reunification services. The court also found father was K.T.'s presumed father and, because he was in the process of serving a lengthy prison sentence, denied him reunification services under section 361.5, subdivision (b)(12).

Shortly after mother gave birth to D. in October 2019, CFS filed a dependency petition on the infant's behalf under section 300, subdivision (j) (abuse of a sibling). At the detention hearing that same month, mother again reported having possible Blackfeet ancestry. When the court asked her if her family was affiliated with any other tribes, she said she didn't know. However, D.'s counsel told the court that some of mother's

5

relatives who were sitting in the back of the courtroom claimed Cherokee heritage. Without identifying the relatives or inquiring about their claim, the court noted there was a dependency proceeding for D.'s siblings and ICWA was being addressed in that case. The court ordered the parents to cooperate if there was any missing information from the prior ICWA notices and ordered CFS to consult with their counterparts in K.T.'s case, as well as any available relatives, before preparing ICWA notices for D. Again, the record contains no indication CFS did so, and on December 2, they sent notice to the Blackfeet Tribe and three federally recognized Cherokee tribes containing the same information about mother's side of the family as the notices they sent on K.T.'s behalf in June.

In February 2020, the court took dependency jurisdiction over D. and removed her from mother and D.M.

By June 2020, the Blackfeet Tribe and two of the three federally recognized Cherokee tribes—the Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians—had responded that D. did not qualify for membership. The court found CFS had completed ICWA noticing for D. and ICWA did not apply.

In August 2020, the juvenile court returned K.T. and D. to mother and D.M. after finding they had made sufficient progress on their case plans and no longer posed a substantial risk of harm to the children. About two months later, mother inflicted serious injuries upon D. when she threw her to the floor. The court immediately detained the children in foster care and, in April 2021, sustained supplemental dependency petitions and bypassed reunification services to all three parents.

6

On April 14, 2021, the court found ICWA did not apply to either K.T. or D. At the children's permanency planning hearing several months later in September 2021, the court terminated mother's, D.M.'s, and father'ss parental rights. The court found both K.T. and D. were bonded to their current caregivers and selected adoption as their permanent plan.

## II

## ANALYSIS

Mother and father argue CFS failed to adequately investigate the children's status as Indian children, and D.M. joins mother's argument as it relates to D. (See *In re T.G.* (2020) 58 Cal.App.5th 275, 291 ["Non-Indian parents have standing to raise issues of ICWA compliance on appeal"].) CFS concedes their error.

A.      *ICWA's Purpose and Protections*

Congress enacted ICWA over 40 years ago to address "'abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) Congress found "'that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.'" (*In re W.B.* (2012) 55 Cal.4th 30, 48, quoting 25 U.S.C. § 1901(5).) As a result, ICWA's express purpose is "to protect the best interests of Indian

children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." (25 U.S.C. § 1902.)

In short, ICWA's aim is "'that, where possible, an Indian child should remain in the Indian community.'" (*In re W.B.*, *supra*, 55 Cal.4th at p. 48.) ICWA effectuates this goal by giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation. (25 U.S.C. § 1911(b)-(c).)

When ICWA applies, the Indian tribe has a right to intervene in or exercise jurisdiction over the proceeding. (25 U.S.C. § 1911.) If the tribe does not assume jurisdiction, the state court must nevertheless follow various heightened procedural and substantive requirements, such as stricter removal standards and mandatory placement preferences that promote keeping Indian children with family members or members of their tribe. (25 U.S.C. § 1912(f); see also *In re W.B.*, *supra*, 55 Cal.4th at pp. 48-49 [describing ICWA's procedural and substantive requirements].) Importantly, violations of ICWA "'render[ ] the dependency proceedings, including an adoption following termination of parental rights, vulnerable to collateral attack if the dependent child is, in fact, an Indian child.'" (*In re E.H.* (2018) 26 Cal.App.5th 1058, 1072; see 25 U.S.C. § 1914.)

B.    *Notice to Tribes*

ICWA applies to any child custody proceeding involving an "Indian child," which is defined as an unmarried person under 18 who is either a member of an Indian tribe or is eligible for membership and is the biological child of a tribe member. (25 U.S.C. § 1903(4).) In any state court proceeding seeking to place a child in foster care or terminate parental rights where the court or social worker "knows or has reason to know" that an Indian child is involved, ICWA requires that notice be sent to any tribe to which the child belongs, or in which they may be eligible for membership, informing the tribe of the pending proceedings and its right to intervene. (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3, subds. (a), (a)(3), (a)(5)(H)(ii), (d).)

Under section 224.2, subdivision (d), "There is reason to know a child involved in a proceeding is an Indian child under any of the following circumstances: [¶] (1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child. [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village. [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court. [¶] (6)

9

The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."

Because ICWA defines "Indian child" in terms of tribal membership, not race or ancestry, "the question of membership is determined by the tribes." (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 294; see also *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 65, fn. 21 [the Indian tribe is final arbiter of its membership rights].) Notice to the tribes is therefore "central to effectuating ICWA's purpose" because it enables the tribe "to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the matter." (*In re T.G.*, at p. 288.)

Notices must include the identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known. (§ 224.3, subd. (a)(5)(C).) As a best practice, they should also contain "all available information about the child's ancestors, especially the ones with the alleged Indian heritage." (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.) The child protective agency must send notice of all hearings until the court determines ICWA does not apply. (§ 224.3, subd. (b).) But even after such a determination, if the court or the child protective agency receives new information that was required to be in the ICWA notice, the agency must provide the new information to the applicable tribes. (§ 224.2, subd. (j).)

Failure to comply with ICWA's notice provisions and determine whether the statute applies constitutes prejudicial error requiring reversal. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1197; *In re B.H.* (2015) 241 Cal.App.4th 603, 608-609.)

C.    *Initial Inquiry*

To ensure that tribes receive notice when required, the court and child protective agency have an "*affirmative and continuing* duty to inquire" whether a child in dependency proceedings "is or may be an Indian child." (§ 224.2, subds. (a) & (b), italics added.) The duty to inquire "begins with initial contact . . . and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 290.)

The court and child protective agency are obligated to ask all relevant individuals involved, including the person who reported the abuse or neglect, "whether the child is, or may be, an Indian child." (§ 224.2, subds. (a) & (b).) The court is required to ask of each at the first appearance in court "whether the participant knows or has reason to know that the child is an Indian child" and to "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*Id.*, subd. (c).)

D.    *Further Inquiry*

Effective January 2019, the Legislature imposed a duty to conduct *additional investigation* into a child's possible status as an Indian child if the court or agency has "reason to believe" the child is an Indian child. (§ 224.2, subd. (e).) In urgency legislation

11

effective September 18, 2020, the Legislature defined "reason to believe" as having "information *suggesting* that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd. (e)(1); Assem. Bill No. 2944 (2019-2020 Reg. Sess.) Stats. 2020, ch. 104, § 15, italics added.) Thus, the obligation—commonly referred to as the duty of further inquiry—applies even if the information suggesting a child may have an affiliation with a tribe "isn't strong enough to trigger the notice requirement." (*In re S.R.* (2021) 64 Cal.App.5th 303, 314.)

To satisfy the duty, the agency must, "as soon as practicable," interview the parents and extended family members, contact the BIA, and contact "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C).) Contacting the tribe entails "sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination." (§ 224.2, subd. (e)(2); see *In re D.F.* (2020) 55 Cal.App.5th 558, 567.)

    E.    *CFS Did Not Adequately Investigate the Parents' Claims of Indian Ancestry*

CFS is correct to concede their failure to satisfy the duty of further inquiry. The claims of Indian ancestry and the family information provided by mother, the maternal great-grandmother, father, and the paternal grandmother at the outset of this case

unquestionably provided reason to believe that K.T. (and later D.) is an Indian child, thereby triggering a duty investigate. But, as far as the record shows, CFS made no investigation. As to mother, they should have tried to contact the maternal grandfather or maternal aunt to obtain additional information about possible Blackfeet and Cherokee heritage, and they should have contacted BIA and the Blackfeet and Cherokee tribes to inquire about mother's family. (§ 224.2, subd. (e)(2); see also *In re T.G.*, *supra*, 58 Cal.App.5th at p. 297 [child protective agency had a duty to contact any tribes that may have information regarding the children's tribal membership or eligibility for membership].)

As to father, CFS should have contacted his mother, the paternal grandmother— who appeared in court and whose contact information they had—to obtain more information about the paternal great-grandfather and the relative named Edna that father had listed on his ICWA form. Also, given the disparity between the two forms father submitted—the first claiming Blackfeet and Cherokee heritage; the second claiming Choctaw heritage only—CFS should have followed up with father and/or his mother to ask if they were claiming Choctaw heritage in *addition to* or *instead of* Blackfeet and Cherokee heritage. And, as they should have done with regards to mother's claim of Indian ancestry, they should have contacted BIA, the Blackfeet tribe, the Cherokee tribes, and, depending on father's response, the Choctaw tribes, to inquire about his family.

CFS does not discharge their duty of further inquiry until they make a "meaningful effort" to locate and interview extended family members and to contact BIA and the tribes. (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) "[J]ust as proper notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it." (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 289.) Mother's and father's claims of Indian heritage may lead to a dead end, but that determination should be the result of investigation not assumption.

And, because CFS didn't adequately investigate those claims, the juvenile court should not have found that ICWA did not apply. (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 293.) "[T]he court had a duty either to require [CFS] to provide a report with complete and accurate information regarding the results of [their] inquiry and notice or to have the individual responsible for notice to testify in court regarding the inquiry made, the results of the inquiry, and the results of the notices sent. Only then could the court determine whether [ICWA] applied." (*In re L.S.*, *supra*, 230 Cal.App.4th at p. 1198.)

Over the past three years there have been a significant number of cases from this county in which the failure to adequately investigate ICWA's application required the reversal of orders terminating parental rights. Our division has recently published two such decisions, but the vast majority of cases—at least seventeen by our count—were resolved in unpublished decisions. (*In re S.R.*, *supra*, 64 Cal.App.5th 303 [failure to satisfy duty of further inquiry required reversal of order terminating parental rights]; *In re*

14

*Benjamin M.*, *supra*, 70 Cal.App.5th 735 [failure to satisfy duty of initial inquiry required same]; see also *In re A.C.* (2021) 65 Cal.App.5th 1060 (dis. opn. of Menetrez, J.) [disagreeing with the majority's conclusion that CFS's failure to satisfy duty of initial inquiry was harmless].) This is concerning, especially considering our court's admonishment from nearly a decade ago that we were "well past the stage of '*growing weary of appeals in which the only error is the* [agency's] failure to comply with [] ICWA.'" (*In re B.H.*, *supra*, 241 Cal.App.4th at p. 607.)

ICWA is a vital aspect of our dependency framework, and both social workers and judges have affirmative and continuing duties to follow it—regardless of the actions of the parents involved or the underlying reasons for the dependency. As our Supreme Court explained in *In re Isaiah W.*, our state's goal of providing children with permanent and stable homes does not override the importance of properly determining a child's Indian status and protecting the integrity and stability of Indian tribes. (*In re Isaiah W.*, *supra*, 1 Cal.5th at p. 12.) ICWA compliance should be "swift and early." (*Ibid.*)

## III

## DISPOSITION

We conditionally reverse the section 366.26 orders. On remand, the juvenile court shall (1) direct CFS to comply with the inquiry and notice provisions of ICWA and sections 224.2 and 224.3 and update the court on their inquiry and the tribes' responses and (2) determine whether ICWA applies. If the court determines ICWA does not apply, the orders terminating parental rights shall be reinstated and further proceedings

15

conducted, as appropriate. If the court determines ICWA does apply, the court shall proceed in conformity with ICWA and related state law.

CERTIFIED FOR PUBLICATION

SLOUGH
Acting P. J.

We concur:

RAPHAEL
J.

MENETREZ
J.

16