Filed 6/16/23  In re K.C. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | B322944 |
| | (Los Angeles County Super. Ct. No. 18CCJP04274A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| KENYATA C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Conditionally affirmed, remanded with directions.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

_____

On August 18, 2022 the juvenile court terminated Kenyata C.'s parental rights to her four-year-old daughter, K.C., and transferred the child's care, custody and control to the Los Angeles County Department of Children and Family Services for adoptive planning and placement.  (Welf. & Inst. Code, § 366.26.)[1]  On appeal Kenyata contends the Department breached its affirmative and continuing duty to inquire whether K.C. may have Indian ancestry as defined by the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.  (Welf. & Inst. Code, § 224.2, subs. (a), (b) & (e).)  We agree and remand the matter for full compliance by the Department and the juvenile court with the inquiry and notice provisions of ICWA and California law.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dependency Petition and Termination of Parental Rights*

On September 13, 2018 the juvenile court sustained a petition, as amended by interlineation, pursuant to section 300, subdivision (b)(1), finding true the allegations that K.C. had been born with a positive toxicology screen for amphetamine and Kenyata had a history of substance abuse, had a positive toxicology screen for amphetamine at the time of K.C.'s birth and was a "recent user of ecstasy and marijuana," all of which rendered her "periodically incapable" of providing regular care of

_____

[1]     Statutory references are to this code unless otherwise stated.

infant K.C.  At the October 25, 2018 disposition hearing the court declared K.C. a dependent child of the court, removed her from Kenyata's custody and ordered family reunification services and unmonitored visits for Kenyata.  The whereabouts of K.C.'s alleged father were unknown, and the court declined to order reunification services or visitation for him.

At the December 10, 2019 12-month review hearing (§ 366.21, subd. (f)) the juvenile court found Kenyata's compliance with her case plan had not been substantial.  The court terminated reunification services and set the case for a selection and implementation hearing under section 366.26.

The section 366.26 hearing was held on August 18, 2022.[2] The juvenile court found returning K.C. to Kenyata would be detrimental and K.C. was adoptable.  The court terminated Kenyata's parental rights and identified K.C.'s current foster parents, with whom K.C. had been living since December 2019, as the prospective adoptive parents.

2. *The Department's ICWA Investigation and the Juvenile Court's ICWA Findings*

The Indian Child Inquiry Attachment (ICWA-010(A)) form filed with the dependency petition on July 10, 2018 reported that K.C. had no known Indian ancestry.  The form did not identify anyone whom the social worker had questioned about Indian ancestry.  The detention report stated Kenyata had denied

---

[2] The hearing had been continued several times, in part due to K.C.'s counsel's request for a hearing pursuant to section 361.3 to assess Kenyata's sister, Shineka C., for placement.  The contested section 361.3 hearing was held over five days in April, May and June, 2022, at the conclusion of which the juvenile court denied the request to remove K.C. from her current placement.

having any Indian ancestry.  The report also explained K.C. had been placed with Kenyata's cousin, Joelisha F., but the report did not indicate that Joelisha had been asked whether the family had any Indian ancestry.  The social worker had additionally interviewed four other members of Kenyata's family with whom Kenyata had been living—an aunt, two cousins and a minor-cousin—but there is no record of an inquiry regarding Indian ancestry during these interviews.

On the day of the detention hearing Kenyata filed her Parental Notification of Indian Status (ICWA-020) form on which she checked the box for the option, "I may have Indian ancestry" and listed "Blackfoot" as the tribe.  During the hearing the juvenile court asked Kenyata whether there was a family member who could provide additional information regarding any Indian ancestry.  Kenyata named her cousin Tawana R. and stated Tawana was "my cousin that took me there."  Kenyata stated Tawana's phone number on the record, and it was handwritten on the ICWA-020 form.  The court ordered the Department to investigate the claim of Indian ancestry.

On August 15, 2018 the Department sent Notice of Child Custody Proceeding for Indian Child (ICWA-030) forms to the Bureau of Indian Affairs (BIA), the Secretary of the Interior and the Blackfeet Tribe of Montana.  The forms listed Kenyata's name, current and former addresses and birthplace.  It did not include her birthdate.  The form also included the name, birthdate and birthplace of Kenyata's mother; the name of Kenyata's father; the name, address, birthdate and birthplace of Kenyata's maternal grandmother and the name of Kenyata's deceased maternal grandfather.  There is no record of the

4

Department attempting to directly contact any of these family members.

The jurisdiction/disposition report filed August 20, 2018 included a summary of an interview with Kenyata in which she stated "she was unsure about her Indian Ancestry as she stated she had heard from a cousin in the family that there may be some Indian ancestry" on her mother's side of the family. The Department social worker also interviewed Kenyata's aunt Loria C. regarding possible Indian ancestry. Loria explained she was the half sister of Kenyata's mother: They had the same mother but different fathers. The Indian ancestry, Loria stated, was on her father's side of the family and not on her mother's (and Kenyata's) side of the family.

In a last minute information report filed October 19, 2018 the Department stated it had not yet received responses to the ICWA-030 forms it had sent two months earlier. In addition, on October 15, 2018 a Department social worker called the number for Tawana that Kenyata had provided during the detention hearing. However, the social worker "was unable to make contact as the number provided is not a valid number." There is no record of the Department attempting to obtain additional contact information for Tawana. Further, despite the fact that K.C. was still placed with Joelisha and the Department had frequent contact with her, there is no record of the Department asking Joelisha about possible Indian ancestry.

At the disposition hearing on October 25, 2018 the juvenile court found that, given no response had been received to the

ICWA-030 notices, it did not have reason to know that K.C. was an Indian child.[3]

In July 2019 K.C. was removed from Joelisha's care and placed with a non-related extended family member, Myeshia A. Myeshia had a child with Kenyata's brother, Deshawn S. There is no indication the Department inquired about possible Indian ancestry during its contacts with Myeshia. Nor did the Department attempt to contact Deshawn.

Around the time K.C. was removed from Joelisha's care, the Department assigned a permanency program social worker to K.C.'s case. As described by the social worker during the section 361.3 hearing, the permanency program social worker's role is to "search through a family, both records and speaking with individuals, around finding family connections for children in our foster care system." This was important, she explained, so that the child would know "their story and their own history." During the course of her investigation the social worker identified 13 relatives of Kenyata, many of whom were previously known to the Department. No effort was made to interview these relatives regarding K.C.'s possible Indian ancestry.

In February 2021 Shineka contacted the Department and stated she wanted to obtain custody of K.C. There is no indication the Department inquired about possible Indian ancestry during that conversation or any subsequent conversation while assessing Shineka for placement.

---

[3] There is no indication in the record that responses to the ICWA-030 notices were ever received.

# DISCUSSION

1. *ICWA and the Duties of Inquiry and Notice*

ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq. (2023)) set minimal procedural protections for state courts to follow before removing Indian children and placing them in foster care or adoptive homes. (*In re Y.W.* (2021) 70 Cal.App.5th 542, 551.) The statute authorizes states to provide "'a higher standard of protection'" to Indian children, their families and their tribes than the rights provided under ICWA. (*In re T.G.* (2020) 58 Cal.App.5th 275, 287-288; see 25 U.S.C. § 1921.) In addition to significantly limiting state court actions concerning out-of-family placements for Indian children (see *In re T.G.*, at pp. 287-288), ICWA permits an Indian child's tribe to intervene in—or, where appropriate, exercise jurisdiction over—a child custody proceeding (see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8).

To ensure Indian tribes may exercise their rights in dependency proceedings as guaranteed by ICWA and related state law, investigation of a family member's belief a child may have Indian ancestry must be undertaken and notice provided to the appropriate tribes. (§ 224.2, subd. (a) [imposing on the court and child protective services agencies "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child"]; see *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742.) The duty to inquire "begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G., supra,*

7

58 Cal.App.5th at p. 290; accord, *In re Antonio R.* (2022) 76 Cal.App.5th 421, 429; see § 224.2, subds. (a)-(c).)[4]

───────────────

[4]   The Department's duty of inquiry, beginning at initial contact, as now defined in section 224.2, subdivision (b), was added to the Welfare and Institutions Code by Assembly Bill No. 3176 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 833, § 5), effective January 1, 2019. Assembly Bill No. 3176 substantially revised the provisions of California's ICWA-related statutes to conform their language to language in then-recently adopted federal regulations and, recognizing California's higher standard for investigating whether a child may be an Indian child, to specify more clearly the steps a social worker, probation officer and court are required to take in making an inquiry into a child's possible status as an Indian child. (*In re T.G., supra,* 58 Cal.App.5th at p. 296.)

Although that legislation was not in effect when the initial dependency petition concerning K.C. was filed in 2018, a hearing that culminates in termination of parental rights or an adoptive placement—that is, a section 366.26 selection and implementation hearing—is considered a separate "child custody proceeding" as to which ICWA and related state law requirements, including the duty of inquiry, apply. (See 25 U.S.C. § 1903(1); 25 C.F.R. § 23.2 (2023); Cal. Rules of Court, rule 5.481(a)(2); see also *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 785, fn. 11.) Because Kenyata challenges the implied finding of ICWA inapplicability underlying the order made at the section 366.26 hearing terminating her parental rights, California's ICWA-related statutes and rules of court in effect in 2022, when that hearing was held, apply in this appeal. (See *In re T.G., supra,* 58 Cal.App.5th at p. 289, fn. 13 ["[t]he parties agree the [state's ICWA-related statutes] in effect in January 2020 when the section 366.26 hearings were held appl[y] to these appeals"]; *In re A.M.* (2020) 47 Cal.App.5th 303, 321 ["'[s]ince Mother is appealing from the findings made at the

In addition, section 224.2, subdivision (e), imposes a duty of further inquiry regarding the possible Indian status of the child "[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine there is reason to know that the child is an Indian child." (See also Cal. Rules of Court, rule 5.481(a)(4) [further inquiry must be conducted if the social worker "knows or has reason to know or believe that an Indian child is or may be involved"].)[5] Further inquiry includes, "but is not limited to," interviewing, as soon as practicable, extended family members to gather the biographical information required by section 224.3, subdivision (a)(5), to be included in ICWA notices, contacting the BIA and contacting "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C); see *In re Rylei S.* (2022) 81 Cal.App.5th 309, 316-317.)

If those inquiries result in reason to know the child is an Indian child,[6] notice to the relevant tribes is required. (25 U.S.C.

---

September 6, 2019 section 366.26 hearing and not those in 2017 or 2018, the current ICWA statutes apply'"].)

[5]      References to rules are to the California Rules of Court.

[6]      "For purposes of ICWA, an 'Indian child' is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe." (*In re T.G., supra*, 58 Cal.App.5th at p. 287, fn. 10; see 25 U.S.C. § 1903(4) [definition of "'Indian child'"] & (8) [definition of "'Indian tribe'"]; see also Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

§ 1912(a); Welf. & Inst. Code, § 224.3; see *In re J.S.* (2021) 62 Cal.App.5th 678, 686; *In re T.G., supra*, 58 Cal.App.5th at p. 290.) The governing federal regulations require ICWA notices to include, if known, the names, birthdates, birthplaces and tribal enrollment information of all direct lineal ancestors of the child. (25 C.F.R. § 23.111(d)(3) (2023).) State law mandates inclusion of "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C); see *In re A.M.* (2020) 47 Cal.App.5th 303, 317 ["'If the notice duty is triggered under ICWA, the notice to a tribe must include a wide range of information about relatives, including grandparents and great-grandparents, to enable the tribe to properly identify the children's Indian ancestry. [Citation.] Any violation of this policy requires the appellate court to vacate the offending order and remand the matter for further proceedings consistent with ICWA requirements'"].)

"The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families." (*In re Antonio R., supra*, 76 Cal.App.5th at p. 430; accord, *In re Benjamin M., supra*, 70 Cal.App.5th at p. 742 ["the agency has a duty to gather information by conducting an initial inquiry, where the other party—here a parent . . . —has no similar obligation"]; see also *In re K.R.* (2018) 20 Cal.App.5th 701, 706 ["[t]he court and the agency must act upon information received

from any source, not just the parent [citations], and the parent's failure to object in the juvenile court to deficiencies in the investigation or noticing does not preclude the parent from raising the issue for the first time on appeal"].)

    2. *The Department Failed To Adequately Investigate K.C.'s Possible Indian Ancestry*

The ICWA-020 form filed by Kenyata at the time of the detention hearing indicated Kenyata's belief she had Blackfoot ancestry. That belief was confirmed by Kenyata during the detention hearing; and she told the court her cousin Tawana may have additional information. These preliminary responses from Kenyata unquestionably provided reason to believe an Indian child might be involved in the proceeding and triggered the Department's duty to make further inquiry pursuant to section 224.2, subdivision (e), and rule 5.481(a)(4). (See *In re T.G., supra,* 58 Cal.App.5th at p. 292 [mother's statement she believed she had Indian ancestry and identification of her grandfather as having possible Indian ancestry were sufficient to require further inquiry]; *In re A.M., supra,* 47 Cal.App.5th at p. 322 [mother's statement she had been told she may have Blackfeet or Cherokee ancestry and identifying her grandfather as having possible Indian ancestry sufficient to require further inquiry].) However, with one exception, there is no indication in the record the Department interviewed any of the family members with whom it had contact regarding K.C.'s possible Indian ancestry. The Department did not attempt to contact Tawana until three months after it obtained her phone number; and, when the number turned out to be invalid, the Department never asked Kenyata, or any other relatives with whom it had

11

regular contact, whether they knew of alternative methods to reach Tawana.

The Department argues it was relieved of its statutory duty to investigate K.C.'s possible Indian ancestry because, when it interviewed Loria, she stated the Indian ancestry was on her father's side and not on Kenyata's side of the family. As the Department puts it, Loria "would presumably have more information regarding Indian ancestry in the family than would the mother's cousin." However, the record does not establish Tawana's place in the family tree, that is, whether she was related to Loria's father and thus, likely shared Loria's ancestry, or whether Tawana was related to Kenyata in another way such that her potential Indian ancestry would be shared by Kenyata— and perhaps be unknown to Loria. The Department's presumption that Loria's explanation was dispositive of K.C.'s ancestry reflects a troubling indifference to the importance of ICWA and the Department's responsibilities for its good faith implementation.[7]

Once the duty to investigate has been triggered, as it was here, "a social services agency has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.*, *supra,* 20 Cal.App.5th

_____

[7]    As we have previously cautioned the Department, an assumption about what a family member should know regarding his or her family history "overlooks recent findings on the impact this country's decades-long efforts to destroy Indian families and eradicate Indian history and culture, including through abuses of the child welfare system, may have on a family's awareness of its Indian ancestry." (*In re Rylei S.*, *supra,* 81 Cal.App.5th at pp. 321-322.)

12

at p. 709.)  One relative's denial of Indian ancestry on the part of the child does not relieve the Department of its statutory responsibilities.  Once the Department had contact information for K.C.'s extended family members, it was required to make a meaningful effort to obtain information from them.  There is no excuse for its failure to do so.

In addition, although the Department sent formal ICWA-030 notices to the Blackfoot Tribe of Montana, section 224.2, subdivision (e)(2)(C), requires the Department to have informal contact and to share information with a tribe in which a dependent child may be a member in order to develop the pertinent information—not simply to send a formal ICWA-030 notice.  (See *In re T.G., supra*, 58 Cal.App.5th at p. 290 ["[t]his informal contact with the tribe must include 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination'"]; see also *In re D.S.* (2020) 46 Cal.App.5th 1041, 1049 ["[t]he sharing of information with tribes at this inquiry stage is distinct from formal ICWA notice"].)  There is no record of the Department complying with this obligation.

The Department's breach of its duty of inquiry was compounded in this case by the juvenile court's failure to ensure compliance with ICWA's requirements before finding ICWA did not apply to the proceedings.  (§ 224.2, subd. (i)(2) [court may make a finding that ICWA does not apply to the proceedings if the court makes a finding, supported by sufficient evidence, "that proper and adequate further inquiry and due diligence as required in this section have been conducted"]; see *In re Rylei S., supra,* 81 Cal.App.5th at p. 320.)

Finally, we are not persuaded by the Department's argument that any failure to conduct a further inquiry regarding K.C.'s possible Indian ancestry was harmless. The Department argues its interviews with Kenyata and Loria and its ICWA-030 notices were sufficient and "any additional inquiries were not likely to bear meaningfully as to whether [K.C.] was an Indian child." As we have stated in the context of the Department's failure to conduct an inquiry pursuant to section 224.2, subdivision (b), "Speculation as to whether extended family members might have information likely to bear meaningfully on whether the child is an Indian child has no place in the analysis of prejudicial error . . . ." (*In re Antonio R., supra,* 76 Cal.App.5th at p. 435.) The same is true when the failure to investigate occurs after the Department has reason to believe a child possesses Indian ancestry. The "missing information was, at the very least, likely to be meaningful in determining whether the children involved were Indian children—whether the information ultimately showed they were or established they were not. Because we do not know what we do not know, nothing more in the way of prejudice need be shown." (*In re Rylei S., supra,* 81 Cal.App.5th at pp. 324, 325 ["the failure to fully comply with a mandatory duty may be harmless error, so long as the record affirmatively reflects that the protections intended to be afforded through the exercise of that duty have been provided"].)

A remand for further inquiry is required in this case.

3. *Omissions in the ICWA-030 Notices Must Be Addressed on Remand*

The Department concedes Kenyata's middle name and date of birth were known by the Department but were not included in the notices sent to the BIA, the Secretary of the Interior and the

Blackfoot Tribe of Montana as required by ICWA. (See 25 C.F.R. §§ 23.11(a) & 23.111(d)(1)-(3) (2023); Welf. & Inst. Code, § 224.3, subd. (a)(5)(C).) However, the Department argues the errors were harmless because Kenyata was not the individual claiming to be a member of or eligible for membership in an Indian tribe.[8] This argument ignores the fact that ICWA notice requirements are strictly construed. (See *In re Y.W., supra,* 70 Cal.App.5th at p. 557; *In re J.S., supra,* 62 Cal.App.5th at p. 688.) Furthermore, because the record does not contain the responses received to the notices, if any, there is no way to determine whether the omissions were material to any eligibility determination.

Nevertheless, given our remand for further investigation, the error is harmless. If further inquiry establishes a reason to know K.C. is an Indian child, then the Department will be required to send complete notices pursuant to section 224.3, subdivisions (a) and (b). If it is determined there is no reason to know K.C. is an Indian child, then no notice will be required; and any error in the prior notices will not have adversely affected the outcome of the proceedings or the rights of any Indian tribes. (See *In re T.G., supra,* 58 Cal.App.5th at p. 298 [failure to provide notice harmless where further inquiry to be done on remand].)

---

[8] ""'[O]rdinarily failure in the juvenile court to secure compliance with [ICWA's] notice provisions is prejudicial error." [Citations.] Any failure to comply with a higher state standard, however, "must be held harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error."" (*In re Y.W., supra,* 70 Cal.App.5th at p. 558; accord, *In re E.H.* (2018) 26 Cal.App.5th 1058, 1072.)

## DISPOSITION

The August 18, 2022 order terminating Kenyata's parental rights is conditionally affirmed. The matter is remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.

16